S. S. Kashat and Khyria Kashat v. Commissioner. S. S. Kashat v. Commissioner.
S. S. Kashat & Kashat v. Comm'r
Docket Nos. 35089, 35090.
United States Tax Court
1954 Tax Ct. Memo LEXIS 261; 13 T.C.M. (CCH) 271; T.C.M. (RIA) 54092; March 29, 1954
Edgar W. Pugh, Esq., 3353 Penobscot Building, Detroit, Mich., for the petitioners. R.G. de Quevedo, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax and the income and victory tax of the petitioners and additions to tax under section 293 (b) of the Internal Revenue Code as follows for the indicated years: Docket
Deficiency
Addition
No.
Year
in tax
to tax
S. S. Kashat
35090
1941
$ 132.05
$ 66.02
1942
716.83
358.41
1943 *
558.89
297.79
1944
10,908.62
5,454.31
1945
8,191.91
4,095.95
1946
1,698.43
849.21
1947
1,386.69
693.34
*262 Docket
Deficiency
Addition
No.
Year
in tax
to tax
S. S. Kashat
and Khyria
Kashat
35089
1948
$ 1,310.44
$ 655.22
The issues presented are the correctness of the respondent's action in determining that (1) the petitioner had taxable income for the year 1941, (2) the income reported by the petitioners for the years 1942 through 1948 was understated, (3) the petitioners were liable for additions to tax for fraud for the years 1941 through 1948 under section 293 (b) of the Internal Revenue Code, and (4) the period of limitations for assessment of tax for the years 1941 through 1948 has not expired. Findings of Fact Some of the facts have been stipulated and are found accordingly. Shamoon S. Kashat, hereinafter referred to as the petitioner, resided with his wife, Khyria Kashat, in Detroit, Michigan, during the years 1941 through 1948. The petitioner filed Federal income tax returns for the years 1942 through 1947 and a joint Federal income tax return with his wife for the year 1948 with the collector for the district of Michigan at Detroit. The petitioner was born in 1903 in Telkaif, Mosul, Iraq, formerly known *263 as Mesopotamia. His formal education consisted of no more than several months' schooling in his early childhood. The village of Telkaif, Mosul, Iraq, was a small farming community which consisted of perhaps 1,000 houses. Petitioner's house in this village consisted of a one-room basement and a flrst floor which also had one room. The basement had a dirt floor and was used for the storage of food and other necessary provisions. The first floor was used by petitioner and other members of his family as the living area. It was very sparsely furnished, and the occupants slept on the floor. Petitioner arrived in this country in 1927. He financed the trip with funds received from his mother. He proceeded immediately to Detroit where he was employed by others until 1929. This employment consisted of working for the Proctor Creamery as a helper on a truck for no more than $10 a week and thereafter for the Ford Company. In 1929 petitioner opened a grocery store on the corner of Mack Avenue and Canton Street in Detroit, Michigan, using a portion of funds which he had brought with him from Iraq, together with whatever funds he had been able to save from employment since his arrival in this *264 country. Associated with him in the store were acquaintances of his who were also from Iraq. After operating the business for less than eight months, the associates purchased petitioner's interest in the business at a purchase price of $50. He actually received only $4 of this amount. The petitioner worked at various odd jobs after selling his interest in the store. In 1934 he opened a grocery store at 2209 Park Avenue, Detroit, Michigan. He had a partner in the store who had furnished no capital. After several months' operations the petitioner purchased his partner's interest for approximately $1,000. Petitioner continued to operate the store until 1936 at which time he sold the business for $5,700. Petitioner's mother died in Iraq in 1933. Petitioner used some of the money he received from the sale of his store to finance a voyage to Iraq. He left the United States in November 1936 and arrived in Telkaif after Easter 1937. He visited friends in Iraq and subsequently married his present wife who was at that time a citizen of Iraq. Petitioner left Telkaif with his wife in 1938 and arrived in the United States in January 1939. A portion of their baggage consisted of four suitcases. *265 One of the cases was used to carry some of the petitioners' clothing. A description of the three other suitcases is as follows: (1) a black metal suitcase with metal bands riveted around the width, dimensions 25 1/2 inches long, 14 1/4 inches wide, 10 1/2 inches deep, weight 14 pounds 12 ounces, cubic capacity 3815.4375 cubic inches; (2) a brown simulated leather suitcase with a broken handle and covered by a green canvaslike cover, dimensions 27 1/4 inches long, 16 1/2 inches wide, 7 1/2 inches deep, weight 11 pounds 12 ounces, cubic capacity 3403.125 cubic inches; and (3) a green metal suitcase with three metal bands running across the top, a broken lock and a torn customs stamp, dimensions 30 3/4 inches long, 17 inches wide, 11 inches deep, weight 15 pounds 14 ounces, cubic capacity 5750.25 cubic inches. Petitioner did not make a declaration of cash on hand to the United States Customs upon arrival in the United States. After his arrival in the United States, petitioner and his wife went to Detroit by train. Within a week after his return to Detroit, petitioner purchased a grocery store at 5069 Trumbull Avenue for $3,000. A portion of the cash used to pay for the store was drawn *266 from petitioner's bank account at the National Bank of Detroit. This grocery store was operated by the petitioner during the entire period 1941 through 1948. In 1941 petitioner purchased his present home at 89 Taylor, paying $7,000 cash. Petitioner obtained $2,500 of the purchase price from a postal savings account he had opened on November 13, 1936. The balance of the purchase price was withdrawn from a savings account maintained by the petitioner at the National Bank of Detroit. Petitioner purchased some additional property at Second and Euclid Streets in 1944. This property consisted of two two-family terraces for which he paid $11,000 in cash. An undisclosed portion of the cash used to pay for the property came from his bank account. Petitioner purchased approximately $9,000 worth of United States savings bonds, series E, during 1943 and 1944. On June 21, 1945, petitioner purchased a parcel of property at the intersection of Trumbull and Putnam Streets in Detroit for $38,000. This property consisted of approximately eight stores. A portion of the cost of the property, $9,000, was obtained by cashing in the war bonds purchased in 1943 and 1944. Petitioner also borrowed $10,000 *267 from a bank. The balance, $19,000, was paid in cash. The money borrowed from the bank was repaid in 1946 and 1947. Petitioner also purchased a lake lot in 1947 for $1,000 cash. The respondent requested the petitioner to present his books and records on several occasions. No books and records were presented to respondent for any of the years 1941 to 1948, inclusive. In the foregoing situation the respondent determined the petitioner's income for such years by the use of an increase in his net worth, plus additions for personal and living expenses as determined by him. The following statement is the respondent's computation of the petitioner's net worth and cash expenditures from December 31, 1940 to December 31, 1948, inclusive: 12/31/40
12/31/41
12/31/42
12/31/43
12/31/44
Adjusted cash on hand
Adjusted bank balance
$ 6,063.18
$ 2,560.98
$ 4,674.98
$ 6,858.30
$ 9,902.95
Adjusted stocks & bonds (cost)
500.00
500.00
500.00
1,100.00
9,556.25
Postal savings
2,750.00
Merchandise inventory
1,500.00
1,500.00
1,500.00
1,380.00
900.00
Real estate (land & bldg.)
7,000.00
7,000.00
7,000.00
18,000.00
Business furn. & fixtures
1,500.00
1,500.00
1,500.00
1,500.00
1,500.00
Automobiles
275.00
275.00
275.00
275.00
275.00
Insurance premiums (cumulative)
24.05
194.83
365.61
536.39
707.17
Corrected total assets
$12,612.23
$13,530.81
$15,815.59
$18,649.69
$40,841.37
Less: Reserve depreciation
300.00
450.00
600.00
750.00
1,170.00
Total assets less depreciation
$12,312.23
$13,080.81
$15,215.59
$17,899.69
$39,671.37
Less: Mortgages payable
Net assets
$12,312.23
$13,080.81
$15,215.59
$17,899.69
$39,671.37
Less: Net assets preceding year
12,312.23
13,080.81
15,215.59
17,899.69
Annual net asset increase
$ 768.58
$ 2,134.78
$ 2,684.10
$21,771.68
Total misc. expense
1,600.00
1,700.00
1,700.00
1,800.00
Total income
$ 2,368.58
$ 3,834.78
$ 4,384.10
$23,571.68
Less income per return
855.91
1,982.85
1,961.85
Understatement
$ 2,368.58
$ 2,978.87
$ 2,401.25
$21,609.83
Dependency credit
3
4
5
5
*268 12/31/45
12/31/46
12/31/47
12/31/48
Adjusted cash on hand
Adjusted bank balance
$ 1,397.84
$ 2,966.25
$ 6,856.30
$ 7,851.88
Adjusted stocks & bonds (cost)
500.00
500.00
500.00
500.00
Postal savings
Merchandise inventory
1,300.00
1,250.00
1,420.00
800.00
Real estate (land & bldg.)
56,000.00
56,000.00
57,000.00
57,000.00
Capital improvements thereto
1,180.00
1,180.00
1,180.00
380.00
380.00
380.00
Business furn. & fixtures
1,500.00
1,500.00
1,500.00
1,500.00
Automobiles
275.00
275.00
275.00
2,913.00
Insurance premiums (cumulative)
877.95
1,048.73
1,219.51
2,944.58
Corrected total assets
$61,850.79
$65,099.98
$70,330.81
$75,069.46
Less: Reserve depreciation
2,220.00
3,810.00
5,518.00
7,226.00
Total assets less depreciation
$59,630.79
$61,289.98
$64,812.81
$67,843.46
Less: Mortgages payable
8,900.00
2,039.89
Net assets
$50,730.79
$59,250.09
$64,812.81
$67,843.46
Less: Net assets preceding year
39,671.37
50,730.79
59,250.09
64,812.81
Annual net asset increase
$11,059.42
$ 8,519.30
$ 5,562.72
$ 3,030.65
Total misc. expense
2,000.00
2,000.00
2,300.00
3,000.00
Total income
$13,059.42
$10,519.30
$ 7,862.72
$ 6,030.65
Less income per return
3,356.39
7,069.41 *
4,010.41
5,299.35
Understatement
$ 9,703.03
$ 3,449.89
$ 3,852.31
$ 731.30
Dependency credit
6
6
6
6
*269 The following statement shows the deposits, withdrawals, interest and year end balance of petitioner's savings account No. XXXX at the National Bank of Detroit for the indicated years: Year
End
With-
Balance
Year
Deposits
drawals
Interest
(12/31)
1934
$ 51.00
$ 51.00
1935
50.00
$ 50.00
$ .25
51.25
1936
6,507.00
2,439.36
15.21
4,134.10
1937
1,797.75
50.24
5,982.09
1938
287.45
508.25
59.82
5,821.11
1939
10.40
2,100.00
37.38
3,768.89
1940
900.00
455.00
39.18
4,253.07
1941
183.46
4,150.00
2.55
289.08
1942
1.89
290.97
1943
2,124.01
17.89
2,432.87
1944
2,390.66
42.21
1945
37.21
5.00
1946
5.00
1947
5.00
1948
5.00
1949
5.00
Petitioner had $1,105.48 in account No. X9706 in Commonwealth Bank in March 1939. The average thickness of 100 American bills of any denomination is one-half inch. In the year 1929 the size of the American *270 bill changed from the large size to that currently in circulation. The plane dimensions of a United States bill are 2 1/2 inches by 6 inches. Petitioner did not file an income tax return for the year 1941. The petitioner's income tax returns for 1945, 1946, 1947 and 1948 were filed with the collector on March 15, 1946, March 15, 1947, March 15, 1948 and April 4, 1949, respectively. Petitioner's net worth for each of the years from December 31, 1940 to December 31, 1948, inclusive, is as indicated in the respondent's net worth statement set forth in these Findings of Fact. All of the deficiency in the petitioner's income tax for each of the years 1941 through 1948 is due to fraud with intent to evade tax. Opinion Respondent determined deficiencies in petitioner's income and victory tax, together with additions to tax under section 293 (b) of the Internal Revenue Code, for the years 1941 through 1948, inclusive. Since no books and records were produced by the petitioner at the request of respondent or his agents, the respondent has determined petitioner's income by use of increases in his net worth for those years. The petitioner has stipulated that *271 all items on the net worth statement prepared and used by respondent in determining the petitioner's increases in net worth are correct except the amount of cash that he had on hand on December 31, 1940. The petitioner contends that on that date he had $38,000 more than the opening cash with which respondent has credited him. The petitioner contends that as a consequence the respondent has understated his assets at the beginning, December 31, 1940, and overstated the increase in his net worth and his income for the succeeding years. The petitioner offers the following explanation of the source of his accumulation: Before he made his first trip to the United States in 1927 his mother told him that she had hidden in the basement of their home in Iraq an earthen crock containing gold. She told him that when she died the gold was to be his. He had not theretofore and did not then see the crock. He came to America and went into the grocery business. His mother died in 1933 in Iraq. In 1936 he decided to go back to his native land. He sold his store for $5,700 and sailed for Iraq in November 1936, arriving in Telkaif at or about Easter of 1937. Upon his arrival he contacted the local priest *272 who gave him a list of the people to whom his mother had loaned money. He collected these debts in Iraq dinars but has no recollection of the number of dinars he received although he received $7,000 in American dollars after exchanging the Iraq dinars. His mother, he claims, owned several parcels of land in Telkaif, the parcels varying in size from three to seven acres. The land was sold by him at prices ranging from $100 to $400 an acre. He does not remember how many dinars he received from the real property but stated that when he exchanged the dinars he received about $7,000 in American dollars. He also stated that he went to the basement of the house where he lived before he came to America in 1927 and, after repeated attempts, finally located the earthen crock his mother had previously mentioned to him. No one other than himself knew of the existence of the hidden crock. Upon locating the crock he discovered the top was about 2 1/2 feet below the level of the basement floor. The record does not disclose that he did more than remove sufficient earth to expose the top or mouth of the crock. He described the crock as being about 18 inches wide in the center and about 24 inches high. *273 He said it was green and had two handles. The crock did not have a cover but there was a smooth flat river stone used in place of a cover. The crock was not taken out of the ground. He simply opened the ground sufficiently to expose the mouth of the jar, removed what he wanted and then covered the hole with straw. He stated that the crock contained gold coins and jewelry. He removed portions of the contents from time to time and took them to Mosul to be sold and exchanged for Iraq dinars. He does not remember how many dinars he received in exchange for the contents of the crock but knows that the contents were worth $29,000 in American dollars. He stated that the dinars he received from the debts owed to his mother by the Telkaif villagers, from the sale of the land, and from the sale of the contents of the crock were all exchanged for American dollars in the markets at Mosul and Bagdad and came to a total of 43,000 American dollars. During the period that he was collecting dinars and exchanging them for American dollars, he married his present wife. He then returned to the United States. He brought with him four suitcases. One suitcase was used for personal effects, clothing, etc. *274 Two of the other suitcases contained $38,000. The American bills were placed in piles, with rubber bands around them, covered with thin blankets, and filled two of the suitcases. The remaining suitcases contained some spending money and clothing. The suitcases were not opened by the Iraq customs officers when leaving the country. From Telkaif he and his wife went to Mosul, then Bagdad, Damascus, Mount Lebanon, and Beyrouth. From Beyrouth petitioners went to Alexandria, Egypt. He stated that his wife stayed in her room during the trip, and that one of them constantly guarded the luggage. He does not remember at what port the boat docked in the United States. At the United States Customs inspection on the dock, only one of the suitcases was opened by the officer, and the one opened did not contain much money. From the boat he and his wife took a train to Detroit where they were met by some of his friends. He rented a room and kept the luggage containing the money in the room with him. Either he or his wife stayed in the room to guard the money. He at no time deposited any of the money in the bank. Later he bought a home at 89 Taylor Street and kept the suitcases containing the money *275 in the cellar. Petitioner's account of the source of the cash funds, by the use of which he was enabled to purchase approximately $60,000 worth of property in this country subsequent to his return from Iraq, is, on the face of it, bizarre and partakes of the character of fiction when viewed in the light of the mundane facts and circumstances surrounding the average existence of a citizen of this country. For instance, petitioner's explanation, which begins in a small Iraq farming community of about 1,000 homes, appears incredible. His home consisted of a basement and a first floor. The basement had a clay floor and the first floor was sparsely furnished, with the occupants sleeping on the floor. In these surroundings petitioner would have this Court believe his mother was loaning money to the villagers, owned a great deal of land, and had an earthen crock buried beneath the basement floor containing gold coins and jewelry, all totaling some $43,000 in value. When viewed, however, in the light of the facts and circumstances surrounding the existence of a citizen of Iraq his testimony may be substantially true and in accordance with what may actually be the fact. In this situation *276 it is most important that petitioner carry his burden of proof as to the asserted deficiency for we are without means to discover those landmarks by which it is possible to mark a course between the truth or falsity of petitioner's account of the source of his funds unless petitioner himself points them out. This he had failed to do in a convincing manner. On the contrary, certain features of his narrative indicate strongly that it is truly fictional and not fact. He indicates that the funds derived by him from Iraq after exchange to American currency occupied two of the suitcases described in the statement of facts, in fact that they packed those suitcases. This statement is obviously untrue, as mathematical computation discloses that the amount he claims to have derived abroad and exchanged for American one dollar bills could have completely filled but one of the suitcases. His account of the discovery of the earthen jar in the parental home and his removal therefrom of the contents also tends to indicate the falsities of his testimony. He testified that he had never seen the jar prior to removal of its contents and that he did not then do more than remove the earth over the opening. *277 Yet he describes somewhat in detail the shape and size of the jar, its color and what is exceedingly significant he testified that the jar was equipped with external handles. That he could in such detail describe the shape and color of the jar and also be aware that appended thereto were two external handles without having unearthed the jar or at any time having seen the same unearthed is also incredible to us. In our opinion, the petitioner's explanation of the source of his claimed opening cash can not be accepted for another reason. Petitioner told the examining revenue officers he had received $15,000 by mail which had been collected by friends after his mother's death. He also told them he brought $35,000 from Iraq, part of which was carried on his person underneath his outer clothing and the remainder in a small canvas handbag which he carried himself. He told them that no one knew of the money, not even his wife, and that the money was kept in a trunk in his attic. This explanation differs greatly from the story he has told us, i.e., that the money was carried in three suitcases, that his wife knew of the money, and that it was kept in his basement. If there is an explanation *278 of these apparently damning features of his testimony none was furnished us. We have no other alternative but to find that petitioner's account of the source of his opening cash in untrue. Lastly, petitioner testified that between 1933 and 1936 he received letters from a priest in Iraq. Near the close of the hearing in these proceedings petitioner's attorney stated that he had received from people in Telkaif certain letters which he indicated corroborated petitioner's explanation of the source of the $38,000. None of the foregoing letters was introduced at the trial. Petitioner's failure to offer them forces us to conclude that if they had been introduced they would not have been helpful to petitioner. Wichita Terminal Elevator Co., 6 T.C. 1158; affd. 162 Fed. (2d) 513. The Court has considered the entire record regarding the petitioner's contention that he had on hand on December 31, 1940, a sum of $38,000 originating with an inheritance from his mother and has concluded that he did not have such sum on hand on that date. The net worth statement which petitioner stipulates as being correct except for the cash on hand December 31, 1940, shows an increase *279 of $47,095.06 in the petitioner's net worth from December 31, 1940 to December 31, 1948. Had we concluded that petitioner had on hand on December 31, 1940, the $38,000 in controversy we still would be without an explanation as to his failure to report the increase in his net worth of the difference of $9,095.06. From the record before us, we are unable to conclude that respondent erred in determining the understatements of income as shown in the net worth statements set out in our findings. The next issue relates to the respondent's determination that the petitioner was liable under section 293 (b) of the Internal Revenue Code for additions to tax for the years in question on account of fraud. The respondent has the burden of proving this issue. Fraud is not to be presumed. It must be proven by clear and convincing evidence. Where large amounts of income are not reported over a number of years, where no books are kept by the petitioner, and no reasonable explanation is given for the failure to report the income, there is substantial evidence to establish fraud. Arlette Coat Co., 14 T.C. 751. We have found as a fact that all of the deficiency in *280 the petitioner's income tax for each of the years 1941 through 1948 is due to fraud with intent to evade tax. Therefore, we hold that respondent did not err in asserting the additions to tax under section 293 (b) of the Internal Revenue Code. The last issue raised by the pleadings is as to the correctness of the respondent's determination that the periods of limitation for assessment of tax for the years 1941 through 1948 had not expired. Petitioner filed no return for 1941, therefore the tax may be assessed at any time. Since the petitioner's income tax returns for the years 1942 to 1948, inclusive, are false and fraudulent and were made with intent to evade tax, the periods of limitations for assessment of tax for those years had not expired. See section 276 (a) of the Internal Revenue Code. Decisions will be entered under Rule 50. Footnotes
*. The deficiency for 1943 is in income and victory tax.↩
*. The stipulated net worth statement contains an amount of $6,588.62. The 1946 return of petitioner's income upon which he paid a tax indicates $7,069.41 is the correct income of petitioner for 1946.↩